S97A2005. OTTIS v. THE STATE.
(496 SE2d 264)

HINES, Justice.

Fifteen-year-old Bridgett Lee and her seven-year-old sister Britney Ikharia were found brutally murdered in the apartment they shared with their mother, Barbara Jenkins. A jury found Inez Ann Ottis guilty of the malice murders of the children. For the reasons which follow, we affirm Ottis' murder convictions.[1]

The evidence at trial, construed in favor of the verdicts, established the following. On January 5, 1993, Inez Ottis asked Antonio Lowery, the man she was dating, to be involved with her in a drug deal. Inez wanted Lowery to obtain a vehicle, stolen or otherwise, to be used for the drug transaction, explaining that she did not want to use her own car. Lowery told his friend Robert Floyd about the drug deal, and Floyd agreed to steal the needed vehicle. Floyd accomplished the theft in 30 to 35 minutes, and Inez telephoned her brother, Rudolph Ottis, to meet the group in the stolen vehicle.

The next day, January 6, Inez and the three men assembled at her apartment. Inez made some telephone calls, at the conclusion of which Inez announced that "the lady (Barbara Jenkins) had two kilos of cocaine." Both Inez and Jenkins had connections in the drug trade, and Inez had suspected Jenkins of being involved in a theft in 1992,

---

[1] The killings occurred on January 6, 1993. On April 13, 1995, a Cobb County grand jury indicted Inez Ann Ottis, along with Antonio Jackson a/k/a Antonio Lowery, Rudolph Ottis, and Robert Aaron Floyd, for the malice murders of Bridgett Lee and Britney Ikharia. Inez Ann Ottis was tried by a jury on May 14-17, 1996, and found guilty of the two counts of malice murder. On May 17, 1996, she was sentenced to consecutive terms of life imprisonment. Ottis' motion for new trial was filed on June 6, 1996, amended on March 18, 1997, and on April 22, 1997, and denied on May 2, 1997. A notice of appeal to the Court of Appeals was filed on May 23, 1997, and the case was docketed in the Court of Appeals on August 14, 1997. The appeal was transferred to this Court on August 18, 1997, and docketed in this Court on August 27, 1997. The case was orally argued on November 17, 1997.

which had led to Inez' arrest. Inez took $2,000 in cash, and the four set off for Barbara Jenkins' apartment. Rudolph Ottis and Floyd used the stolen vehicle and Inez and Lowery rode in Inez' car with Inez leading the way. The two vehicles pulled into the parking lot at Jenkins' apartment complex. Floyd and Rudolph Ottis got into Inez' car and Inez drove the group to a convenience store. Inez gave Lowery $5 and directed him to purchase duct tape. Lowery bought two rolls of the tape, handing it over to Inez, and the four returned to the apartment complex, parking where they could view Jenkins' apartment.

Inez ordered Lowery to knock on Jenkins' door. He did so, and Jenkins' daughter Bridgett came to the door. Lowery asked for Jenkins and Bridgett responded that her mother was not there, but was on her way home. Lowery told the girl that he and Inez wanted to do a drug deal with Jenkins, but Bridgett refused to let him in. Lowery returned to Inez' car, related the exchange, and described the child to Inez. Inez identified the girl as Jenkins' older daughter. Shortly thereafter, Inez went to the apartment herself, was recognized by Bridgett and was admitted. Three or four minutes later, Floyd and Rudolph Ottis went in. Finally, Lowery entered Jenkins' apartment.

When Lowery entered, he saw Bridgett on the floor next to Inez; Inez had pulled the girl's shirt up over her head while Floyd and Rudolph Ottis struggled with Bridgett to tape her wrists, ankles, and face. Lowery was directed to search the apartment; in the process, furniture was turned over and slit open. Jenkins' younger daughter Britney came out of the bath and attempted to flee to her room. Rudolph Ottis grabbed the seven-year-old, threw her on a bed, and struck her head with his fist to make her stop struggling. He then taped Britney's mouth, nose, wrists and ankles. Lowery asked what was going to happen, and Rudolph Ottis replied that the girls had to die because they had seen Inez's face. Inez watched as Rudolph got a knife from the kitchen and slashed Britney's throat. Britney fell off the bed, blood pouring from her neck. The child bled to death on the floor.

Floyd went to the living room and dragged Bridgett, already smothering to death because of the duct tape on her nose and mouth, into the other bedroom. Floyd placed the girl on the bed, and went to the kitchen for another knife. He returned, plunged the knife into Bridgett's chest, penetrating to the mattress below, and slashed her throat. Shaking violently, she fell off the bed onto the floor where she died. As she lay there, Lowery took a knife from Rudolph Ottis and stabbed Bridgett several times in the side. After they left the apartment, Inez commented to Lowery on the need for the killings, "What is done is done, they seen [my] face."

The ransacking of the apartment yielded Inez and her cohorts

two ounces of cocaine and $85.

1. The evidence was sufficient to enable a rational trier of fact to find Inez Ann Ottis guilty beyond a reasonable doubt of the malice murders of Bridgett Lee and Britney Ikharia. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Ottis fails in her contention that the trial court improperly admitted evidence of her January 26, 1995, statements to Detective Herman in violation of *Edwards v. Arizona*, 451 U. S. 477 (101 SC 1880, 68 LE2d 378) (1981). Herman did not testify before the jury about the substance of the statements at issue, but merely that at one point, Ottis indicated that she was willing to tell him what happened inside the Jenkins' apartment.[2]

Furthermore, at a hearing outside the jury's presence, Detective Herman's testimony established that after Ottis was arrested on the murder charges, she was advised of her *Miranda* rights and was transported to the police station. Ottis' handcuffs were removed and she was taken to an outer office where Herman and another detective were present. After the detectives sat down, Ottis indicated that she wanted to talk with them if her attorney was contacted. The detectives made several unsuccessful attempts to contact Ottis' attorney, and Herman returned and informed Ottis that he had been unable to reach her counsel. Ottis then asked Herman why she was being charged with two counts of murder, stating that all she had done "was wait in the car." Herman responded that he thought that the kids were murdered because they recognized somebody. Ottis replied, "[t]hat ain't no reason to kill nobody." Ottis again asked Herman why she was being charged. Herman told Ottis that they had better not talk anymore. Ottis reaffirmed that she was willing to tell the detectives what had happened in the apartment, and Herman again advised her that there should be no conversation in view of the fact that she had requested that the detectives contact her attorney.

Accepting that Ottis' initial statement that she wished to talk to the detectives if her attorney was contacted constituted a clear and unambiguous request to have counsel present so that police questioning had to cease, Herman's informing Ottis that he was unable to contact her attorney was not an impermissible initiation of question-

---

[2] Herman's testimony about Ottis' statements consisted of the following:
[THE STATE]: Coming back, bringing her back to the Cobb County Police Department, did you question her?
[HERMAN]: No, I wouldn't say there was any questioning that took place.
[THE STATE]: At any point, did she indicate to you that she was willing to tell you what happened inside that apartment?
[HERMAN]: Yes.
[THE STATE]: Was she then subsequently taken to the Cobb County jail?
[HERMAN]: To the Women's Annex, Cobb County jail.

ing nor an attempt to elicit any statement by Ottis. It was simply relating the fact that Ottis' counsel could not then be reached. Ottis herself initiated the discussion with the police which led to her spontaneous and volunteered statement placing her at the scene of the crimes, thereby knowingly and intelligently waiving the right she had invoked. *Edwards v. Arizona*, supra, 451 U. S. at 484; *Jordan v. State*, 267 Ga. 442, 445 (1) (480 SE2d 18) (1997). Even if Herman's follow-up comment of his theory of why the children were murdered is deemed to be an "interrogation" within the meaning of *Rhode Island v. Innis*, 446 U. S. 291, 300-301 (100 SC 1682, 64 LE2d 297) (1980), Herman's testimony failed to reveal any evidence of intent to get the accused to make an incriminating statement in response. *Walton v. State*, 267 Ga. 713, 718 (4) (482 SE2d 330) (1997).

3. Inez Ottis is likewise unsuccessful in her hearsay challenge to the admission of evidence of statements by Rudolph Ottis and Robert Floyd.

State's witness Anthony London, who was Rudolph Ottis' cousin, testified that about two weeks after the murders, Rudolph Ottis visited him and confessed to him that he had killed the two children. He told London that he and Inez and two others had gone to Jenkins' apartment to commit a robbery, that Jenkins' children had seen Inez' face and therefore had to be killed, and that the robbery had yielded $85. London told his mother about Rudolph's involvement in the crimes, but the information was not related to authorities until approximately two years later.

State's witness Adolphus Hudson testified about statements made by Rudolph Ottis while the two were incarcerated together. Rudolph related to Hudson that he had not gone into the apartment or tied up or stabbed the children and had been falsely accused of murder; they had gone to the Jenkins' apartment to rob, and the children had been killed because they recognized his sister Inez, and because the children's mother was connected to very powerful people.

Finally, State's witness Wandisha Buffington, who was Robert Floyd's girl friend, related to the jury that in January 1995, Floyd told her that the police were looking for his friend, Rudolph Ottis and possibly for him. Floyd informed Buffington that he had stolen a car and driven Inez, Rudolph, and Lowery to an apartment. Floyd said he stayed in the car and that Inez and Lowery went into the apartment but came back out and said nobody was home.

The trial court properly allowed the jury to consider these statements by Rudolph Ottis and Floyd because the declarations of a conspirator made during the course of the conspiracy, including its concealment phase, are admissible against co-conspirators. OCGA § 24-3-5; *Jones v. State*, 265 Ga. 84 (2) (453 SE2d 716) (1995). Inez, Rudolph, Floyd and Lowery together planned and prepared for get-

ting drugs from Jenkins, participated jointly in the murders of the children, and fled the scene in unison. These actions are sufficient to establish a prima facie case of conspiracy to commit the crimes. *Jones,* supra at 84 (2). Moreover, it was not necessary for the State to prove an express agreement among the conspirators to conceal their criminal activity. The facts that none of the conspirators reported the crimes for over two years after commission, that no conspirator admitted involvement in the crimes, and that Inez expressly disavowed any knowledge of the crimes to law enforcement agents until 1995, give rise to the inference of a tacit agreement among the perpetrators to conceal what they had done. *Duffy v. State,* 262 Ga. 249, 250 (1) (416 SE2d 734) (1992). Rudolph Ottis' confession to London two weeks after the murders did not bring the conspiracy to an end because it was not an incriminating statement made to law enforcement authorities. *Jones,* supra at 85 (2). Compare *Crowder v. State,* 237 Ga. 141, 153 (227 SE2d 230) (1976). Nor did the conspiracy necessarily end when some of the conspirators were arrested and made inculpatory statements, because the conspiracy to conceal the identity of the remaining perpetrators was ongoing. *Waldrip v. State,* 267 Ga. 739, 748 (10) (d) (482 SE2d 299) (1997). Even after their arrests, Rudolph Ottis and Floyd continued to attempt to hide their involvement in the crimes; thus, the conspiracy was still in its concealment stage at the time the statements were made to Hudson and Buffington. *Bundrage v. State,* 265 Ga. 813 (2) (462 SE2d 719) (1995).

Furthermore, the statements were sufficiently reliable to warrant their admission, when assessed by circumstances recognized as indicia of reliability: the absence of an express assertion about a past fact; the declarant had personal knowledge of the identities and roles of the participants in the criminal undertaking so that crossexamination of the declarant would not have shown that the declarant was unlikely to know whether the defendant was involved; the possibility that the declarant's statement was founded on faulty recollection was remote; and the circumstances under which the declarant gave the statement suggest that the declarant did not misrepresent the defendant's involvement in the crime. *Copeland v. State,* 266 Ga. 664, 665 (b) (469 SE2d 672) (1996), applying the factors set forth in *Dutton v. Evans,* 400 U. S. 74, 88-89 (91 SC 210, 27 LE2d 213) (1970) (plurality opinion).

Only the first factor weighs against reliability in that the declarants' statements about the killings, robbery, and car theft are assertions of past facts, rather than circumstances from which the jury is invited to make its own inferences. The remaining factors support a finding of reliability. The evidence showed that the declarants, Rudolph Ottis and Robert Floyd, had personal knowledge of the identities and roles of the perpetrators inasmuch as they were partici-

pants in the crimes. Also, there was little possiblity that the declarants' statements, even those made two years after the crimes, were based on faulty recollection because the participants were unlikely to forget the details of such a slaughter. Finally, the circumstances surrounding the statements do not suggest that the declarants misrepresented Inez Ottis' involvement inasmuch as the statements inculpated the declarants in the criminal enterprise.

4. Lastly, Ottis contests the admission into evidence of what she characterizes as 19 "autopsy" photographs of the victims.[3] However, the photographs specifically cited do not depict the victims after incision or dissection in the autopsy proceedings.[4] The photographs are of articles of clothing worn during the attacks and of the victims as they lay on the pathologist's table, unaltered save for, in some instances, the removal of clothing, duct tape, or excess blood. Such pre-autopsy photographs were relevant to show the location and nature of the children's wounds, and the gruesome or inflammatory aspect of the pictures stemmed entirely from the mutilation of the victims at the hands of Ottis and her cohorts. *Russell v. State*, 267 Ga. 865, 867 (3) (485 SE2d 717) (1997); *Green v. State*, 266 Ga. 550, 551 (3) (468 SE2d 365) (1996). To the extent that Ottis also complains of the projection of the photographs, this method of presentation is permissible absent distortion or disproportion of what is depicted, which is not alleged to have occurred in this case. *Dalton v. State*, 251 Ga. 641 (2) (308 SE2d 835) (1983); *Jones v. State*, 249 Ga. 605, 609 (2) (b) (293 SE2d 708) (1982).

*Judgments affirmed. All the Justices concur.*

DECIDED MARCH 2, 1998.

*Deville, Milhollin & Voyles, Romas A. Deville, Justin J. Wyatt,* for appellant.

*Thomas J. Charron, District Attorney, Debra H. Bernes, Russell J. Parker, Nancy I. Jordan, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Elizabeth L. Jaeger, Assistant Attorney General,* for appellee.

---

[3] The 19 photographs were admitted as State's Exhibit numbers 73, 74, 75, 76, 77, 78, 79, 80, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, and 94.

[4] In brief, Ottis also refers to photographs of organs removed from the victims, admitted as State's Exhibit numbers 81, 82, 83, and 95, but she fails to allege the admission of these photographs as error. However, such photographs may be admissible when they demonstrate material facts concerning the manner of death. *Carr v. State*, 265 Ga. 477 (1) (457 SE2d 559) (1995).