## S03A1475. McDOUGAL v. THE STATE.

(591 SE2d 788)

SEARS, Presiding Justice.

Howard McDougal is charged with malice murder, armed robbery, and other crimes. The State is seeking the death penalty. McDougal moved before trial to suppress his statements to the police, and the trial court, after an evidentiary hearing, denied the motion. This Court granted the application for interim review on this issue and directed the parties to answer the following question: Did the trial court err by denying McDougal's motion to suppress his statements? Having reviewed the record, we conclude that McDougal's statements must be suppressed. Therefore, we reverse in part and affirm in part.

Just after midnight on Monday, May 8, 2000, police found the body of Richard Jorgenson, who had been the only clerk working the Sunday shift at the Olympic Mart on South Cobb Drive, on the floor of the store. He had been shot once in the head and a .25 caliber shell casing was found nearby. The front door was locked and money was missing from the store. The cash register showed that the last transaction, for three dollars worth of lottery tickets, took place at 7:10 p.m. on May 7. Since the convenience store generally made sales transactions every few minutes, the police surmised that the murder took place shortly after 7:10 p.m.

On May 8, Detective Lee received a phone call from Mr. Hester, who said he had gone to the Olympic Mart at 7:15 p.m. on May 7 and observed through the front glass two African-American males in the store with the clerk. One black male, thin, young and of medium height, was walking around the store wearing a black baseball cap. The second black man stood behind the clerk and forced the clerk to lock the front door. This man was holding a gun and Hester described him as 6′ 2″ and 250 pounds. The men then moved to the back of the store and doused the light. Hester turned around and went home. He did not call the police until he heard about the murder.

On the morning of May 9, Detective Lee received a call from a supervisor at American Industrial Chemical Corporation ("AICC"), which is located about a mile from the Olympic Mart. The supervisor

said the day before, a .25 caliber pistol had been found in a dumpster in an area only accessible to employees. Detective Lee went to AICC and obtained the gun; the people who worked there said they knew the gun belonged to employee Howard McDougal because he had tried to sell them the gun the previous week. McDougal had been late for work on May 8; he was nervous when he arrived that morning and he only stayed at work an hour before leaving, saying he was sick. The dumpster is only 40 feet from McDougal's work station and an employee found the gun a few hours after he left. Several employees also told the detectives that McDougal was penniless.

The detectives went to McDougal's apartment at 1:00 p.m. and he agreed to accompany them to the police station for an interview. He told them, however, that he had a 2:00 p.m. job interview. He rode in the front seat of Detective Lee's car, and he was not handcuffed or searched. The officers testified that because he did not match Mr. Hester's initial physical description, McDougal was not yet considered a suspect for the murder and therefore was not in custody. While Mr. Hester had described the robber with the gun as a large man, 6' 2" and 250 pounds, McDougal, who also goes by the nickname "Heavy," is an enormous man at 6' 4" and 450 pounds. Detective Lee did not believe that Mr. Hester could have been so badly mistaken about the suspect's weight, and believed that McDougal might have supplied the robbers with his gun.

McDougal was not advised of his *Miranda*[1] rights; as noted, the officers testified that he was not in custody. McDougal told the police he was a regular customer at the Olympic Mart and that he had been there on Sunday between 5:30 and 6:00 p.m. Because he was a convicted felon, he refused to say whether he owned a gun. Detective Lee told McDougal, "I have enough now on you that I don't have to let you go home today," because he knew McDougal had possessed a .25 caliber pistol. He also told McDougal that the store clerk had been shot with a .25 caliber pistol. The detectives asked McDougal if he had sold or given the gun to someone, but McDougal again balked at admitting anything about the gun because he thought he might be arrested. Detective Lee said the police were not interested in a mere possession charge because they wanted to apprehend the shooter. McDougal asked if he was going to be arrested for gun possession, and Detective Lee responded that he could not "make a commitment" to McDougal about that. McDougal then said he gave a neighbor named Todd his gun on Friday, and that Todd never returned the gun. Detective Lee told McDougal the gun had turned up where he worked, and McDougal speculated that Todd must have slipped into

---

[1] *Miranda v. Arizona*, 384 U. S. 436 (86 SC 1602, 16 LE2d 694) (1966).

AICC and disposed of the gun. McDougal denied having shot anybody, and Detective Lee said he believed him because his size did not match the description. Detective Lee insisted, however, that McDougal knew the identity of the shooter. McDougal then asked for the time, but Detective Lee told him "we're going to be here a little longer" and that McDougal was not going to make his 2:00 p.m. job interview. When asked if he wanted to call the prospective employer, McDougal said he just wanted to "get this over."

The police then told McDougal they were not interested in his being a felon in possession of a firearm, but they could "put that gun in [his] hand already." When McDougal insisted he did not commit the robbery, Detective Lee told him they were just "trying to help [him] out of this." Detective Lee repeated that McDougal did not match the description of the shooter because he would "stick out like a sore thumb," and that they were not interested in the possession charge or he would already be in handcuffs. Eventually, Detective Lee told McDougal that "we're getting to the point now where maybe we should inform you of your *Miranda* rights."

Lt. Waldrop told McDougal that he was going to read him his rights and ask him to sign the waiver form so they could continue to talk. McDougal asked if he was under arrest, and Detective Lee said no. Lt. Waldrop concurred and said, "I'm reading you this to protect you." McDougal then said, "[A]ll the stuff that we talked about before, I don't really want to talk about it no more. Because I'll get myself in trouble." Lt. Waldrop read McDougal his *Miranda* rights, and said he wanted him to sign a waiver form to indicate he understood the rights. McDougal replied, "Before I sign anything . . . I would like to get [my wife] so she can call my lawyer. Because I haven't done anything[, a]nd I feel like the words that I'm saying are like being pushed against me right now." Questioning continued even though McDougal had not signed the waiver or been provided the opportunity to call his wife or a lawyer. The officers became increasingly insistent that he sign the waiver. Lt. Waldrop said, "Then sign that you just understand so that later on when you contact your attorney, he can't say, well, they had him in this little bitty room and they beat him." McDougal did not sign the waiver. Questioning continued. The officers told him they had evidence that he was in possession of the murder weapon before and after the murder and that he had motive because he was broke, and that they had probable cause to arrest him for murder. Lt. Waldrop insisted, "Now understand your rights. Waive your rights. And tell us about whoever killed — you know who killed that poor son-of-a-bitch."

The officers then declared a break in the interrogation, and Detective Geter, who had been pursuing other leads, told Detective Lee that he thought McDougal was the shooter. Detective Geter

explained that he had spoken with a couple who had stopped at the Olympic Mart at 7:10 p.m. on May 7 to buy three dollars worth of lottery tickets — the last transaction before the homicide. They described a black man in the store at this time, whom they saw standing at a video game machine, as being six feet tall and 300 pounds. They observed this "huge" man go outside and converse with another man wearing a dark baseball cap sitting in a parked Buick. Detective Lee telephoned Mr. Hester and asked for another description of the robber with the gun. Mr. Hester said he was 6' 2" and maybe more than 300 pounds. Mr. Hester then elaborated by saying, "The man was huge." Detective Lee testified that at that point, he knew that McDougal was involved in the robbery and murder. Detective Lee went into the interview room and told McDougal, "You've lied to me. I'm going to put your ass in jail for murder." McDougal was taken downstairs and booked and then brought back upstairs because he said he wanted to talk. The officers began to fill out the *Miranda* waiver form. Lt. Waldrop asked McDougal, "During our last conversation, you made the statement that you wanted to make a phone call and call your wife to call your attorney. . . . Is that still your desire, to call your wife and have an attorney present?" McDougal said, "My desire is to be with my family." He signed the waiver and continued to try to implicate Todd, telling the officers he was just sitting in the Olympic Mart when Todd came in and robbed and killed the clerk. McDougal was placed in a holding cell. Ninety minutes later, he requested to speak with the detectives again from his holding cell in the police station. The officers went to McDougal, and he admitted that he had tossed the gun into the dumpster at his workplace and that he was present during the robbery. He told them Allan Martez Johnson, his co-indictee, was the shooter. Neighbors had seen Johnson, a thin, young African-American man, with McDougal on that night.

On May 19, McDougal called the officers from the Cobb County jail and asked to speak to them. The officers went to the jail where McDougal complained that Johnson was "running his mouth" in the jail saying that McDougal was the shooter.

1. McDougal claims that his May 9 statements to the police must be suppressed because he was in custody at the beginning of the interview at the police station and the police did not read him his *Miranda* rights at that time. He also claims that he invoked his right to counsel later in the interview when he was finally read his rights, but that police continued to question him. The State argues that McDougal was not placed in custody until Detective Lee informed him that he was under arrest, and that *Miranda* rights were unnecessary until that time. The State also argues that McDougal did not invoke his right to counsel after being read his rights, and that he

waived his rights by signing the waiver form.

On review of a trial court's ruling on a motion to suppress, this Court will uphold a trial court's findings as to disputed facts unless clearly erroneous, but here there are no disputed facts. Almost the entire exchange between the officers and McDougal was audiotaped and, with regard to testimony about the brief conversation that was not recorded, no question has been raised about witness credibility. When the evidence presented on a motion to suppress is uncontroverted, " 'the trial court's application of the law to undisputed facts is subject to de novo appellate review.' "[2]

A. *McDougal was in custody at the beginning of his May 9 statement.* The police must advise a suspect in custody of his *Miranda* rights before interrogation; otherwise, the suspect's ensuing statement is generally inadmissible.[3] Obviously, interrogation occurred in this case; the dispositive issue is whether McDougal was in custody before *Miranda* warnings were given.

> [T]he determination of whether one is in custody depends upon the objective circumstances attending the particular interrogation at issue, and not upon the subjective views of either the person being interrogated or the interrogating officer. Put another way, the relevant inquiry in determining whether one is in custody is how a reasonable person in the suspect's position would perceive his or her situation.[4]

Therefore, we must determine whether a reasonable person in McDougal's situation would believe he was being restrained to the degree associated with a formal arrest.[5]

Having considered the objective circumstances of McDougal's interrogation, we conclude that a reasonable person in McDougal's situation would have believed he was in the custody of police. McDougal agreed to accompany detectives to the Smyrna police station, and he was not handcuffed or searched. However, upon arrival at the police station, he was led through two locked doors into a secure interview room. When asked about a gun at the beginning of the interview, he tried to avoid answering the question by stating that he was a convicted felon, something the officers had learned during the

---

[2] *Lee v. State*, 270 Ga. 798, 802 (7) (514 SE2d 1) (1999), quoting *Vansant v. State*, 264 Ga. 319, 320 (1) (443 SE2d 474) (1994).

[3] See *Miranda v. Arizona*, 384 U. S. at 479; *Reinhardt v. State*, 263 Ga. 113, 114 (3) (a) (428 SE2d 333) (1993).

[4] *Hardin v. State*, 269 Ga. 1, 2 (2) (494 SE2d 647) (1998).

[5] See *Hodges v. State*, 265 Ga. 870, 872 (2) (463 SE2d 16) (1995); *Lobdell v. State*, 256 Ga. 769, 773 (6) (353 SE2d 799) (1987) (*Miranda* applies to a person "taken into custody or otherwise deprived of his freedom . . . in some significant way.").

car ride to the station. Detective Lee then confronted McDougal with his recent possession of a handgun, and the detectives reminded him several times during the interview that he could be arrested for such a charge. Detective Lee expressly told McDougal that they already had enough evidence about the gun that he "[did not] have to let [him] go home today." The detective would make no commitments to McDougal about whether he would be arrested. That McDougal was not free to leave was further reinforced by Detective Lee's statement to McDougal that he was not going to be released in time for his 2:00 p.m. appointment. In these circumstances, a reasonable person would have believed that Detective Lee's permission was required before the interview could end and he could leave the police station.

The State's argument that the police were mistaken about the size of the murder suspect and were only questioning McDougal to determine the identity of the shooter is unavailing because the subjective intentions of the interrogators are irrelevant to a determination of whether a suspect is in custody. It is also not conclusive as to custody that the detectives told McDougal several times that he was not under arrest, because their actions and other words indicated differently. In fact, Detective Lee told McDougal at the onset of the interview that they did not have to allow him to leave. Viewed objectively, a reasonable person in McDougal's situation would have believed his freedom had been restrained so as to render him in the custody of police.[6] Therefore, McDougal's May 9 statement made prior to the giving of his *Miranda* warnings is inadmissible and must be excluded at his trial.[7]

B. *McDougal invoked his right to counsel.* The police eventually read McDougal his *Miranda* rights and asked him to sign a waiver. McDougal replied that before he signed anything he wanted to call his wife so she could contact his lawyer. He was not permitted to make this call, and the police continued to question him.

> A suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation. [Cit.] If the police persist in questioning a suspect who has requested that counsel be present, any resulting statements made by the suspect are inadmissible in the State's case-in-chief. [Cit.][8]

---

[6] Id.

[7] See *Reinhardt,* supra.

[8] *Taylor v. State,* 274 Ga. 269, 271-272 (1) (553 SE2d 598) (2001). See also *Edwards v. Arizona,* 451 U. S. 477, 484-485 (101 SC 1880, 68 LE2d 378) (1981).

In order for a suspect to properly invoke his right to counsel during a custodial interrogation, he "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."[9] A suspect's statement that he wants to call his lawyer or, as in this case, that he wants to contact his wife so she may call his lawyer, is a clear request for an attorney.[10] McDougal did not use any equivocal words in the request, and his reason for the request, that he believed the "words that [he's] saying are like being pushed against [him] right now," demonstrates that he wanted the lawyer's assistance during the interrogation then being conducted.[11] Because the police continued to question McDougal after his clear and unambiguous request for counsel, his ensuing statements are inadmissible and must be suppressed.[12]

C. *McDougal did not re-initiate the interrogation.* A short time after McDougal was informed that he was under arrest and had finished his initial statements, the police put him in an infirmary holding cell in the jail area attached to the police station. Roughly ninety minutes later, McDougal sent word to the detectives that he wanted to speak with them. They went to see him. Detective Lee had just been interviewing Todd (whom McDougal had implicated in the murder), and he immediately told McDougal upon entering the room that Todd said he had five witnesses who would vouch that he was working at a restaurant on the night of the murder. McDougal said he could get five people to say that McDougal was at work that night, and Detective Lee responded, "No. Howard, you can't do that." McDougal then admitted his participation in the robbery and his possession of the gun. He also incriminated his co-indictee, Johnson, as the shooter.

We are compelled to conclude that this statement did not result from McDougal reinitiating the conversation and waiving his right to counsel.

[E]ven if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel," is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth

---

[9] *Davis v. United States*, 512 U. S. 452, 459 (114 SC 2350, 129 LE2d 362) (1994).
[10] See *Gissendaner v. State*, 269 Ga. 495, 497 (500 SE2d 577) (1998) ("Gissendaner's request to telephone her attorney before leaving her home must reasonably be construed as a request to have her attorney present.").
[11] See *Taylor*, supra at 272-273; *Gissendaner*, supra.
[12] See id.

Amendment right to have counsel present during the interrogation.[13]

The determination of whether a defendant re-initiates an interview with the police and waives his right to counsel after having previously invoked his right to counsel is a two-step process: "[E]ven if the accused initiated the conversation, there must then be an inquiry whether a valid waiver of the rights to counsel and to remain silent occurred."[14] Whether there was a waiver of the previously-invoked right to counsel is based upon the totality of the circumstances.[15] The record shows that McDougal summoned the detectives to the infirmary holding cell, but there is no indication that he waived his previously-invoked right to counsel or even that he intended to initiate the conversation by engaging in a "generalized discussion about the investigation."[16] It is possible that McDougal intended to inquire about when he would be allowed to contact his wife or an attorney, which he had not yet been permitted to do, or when he could see his daughter, which the police had promised to arrange during the initial interview. Before McDougal could speak, though, Detective Lee immediately confronted him with the statement that Todd, whom McDougal had implicated as the shooter, had a strong alibi.[17] There was no mention of an attorney or whether McDougal intended to speak without one. In fact, McDougal did not volunteer any statements during this second interview; his only statements were made in response to Detective Lee's recommencement of the interrogation. Based upon the totality of the circumstances, we cannot conclude that McDougal wished to waive his previously-invoked right to counsel and resume answering questions about the case.[18] Therefore, McDougal's May 9, 2000, statement to the police in the holding cell must be suppressed and is inadmissible at trial.[19]

---

[13] *Oregon v. Bradshaw*, 462 U. S. 1039, 1044 (103 SC 2830, 77 LE2d 405) (1983).

[14] *Walton v. State*, 267 Ga. 713, 716 (3) (482 SE2d 330) (1997). See also *Bradshaw*, 462 U. S. at 1044; *Brockman v. State*, 263 Ga. 637, 639 (1) (b) (436 SE2d 316) (1993); *Sanders v. State*, 182 Ga. App. 581, 583 (1) (356 SE2d 537) (1987).

[15] See *Bradshaw*, 462 U. S. at 1046.

[16] Id.

[17] This constitutes "interrogation." See *Rhode Island v. Innis*, 446 U. S. 291, 301-302 (100 SC 1682, 64 LE2d 297) (1980).

[18] See *Oregon v. Bradshaw*, 462 U. S. at 1045-1047 (defendant waived previously-invoked right to counsel after suspect re-initiated conversation and was informed by officer that he did not have to speak to the police and suspect indicated that he understood); *Walton*, supra at 716-717 (3) (suspect did not waive right to counsel when detective re-initiated conversation); *Brockman*, supra at 638-639 (1) (suspect waived previously-invoked right to counsel when he re-initiated conversation with police, volunteered information, was re-advised of his *Miranda* rights, and executed a written waiver); *Sanders*, supra at 581-583 (1) (suspect waived previously-invoked right to counsel when he re-initiated conversation with the police, was reminded that he had asked for a lawyer, and he said he wanted to continue making a statement).

[19] See *Walton*, supra at 716-717 (3).

2. On May 19, 2000, when McDougal was jailed at the Cobb County Adult Detention Center, he sent word through the jail personnel that he wanted to speak with the detectives again. Detective Lee and Lieutenant Waldrop drove to the jail and they audiotaped their ensuing encounter with McDougal. When McDougal was brought into the room, Detective Lee asked McDougal why he had asked to see them. McDougal complained that his co-indictee, Johnson, was also housed at the jail and was telling other inmates that McDougal had been the shooter. McDougal was upset "[b]ecause I know it's my word against his." Detective Lee said, "It ain't just his word against you. It's also a witness's word." McDougal stated, "I didn't see nobody there, and I told you that."[20] Unlike the statement in Division 1 (C), McDougal himself "initiated [this] discussion with the police which led to [his] spontaneous and volunteered statement placing [him] at the scene of the crimes, thereby knowingly and intelligently waiving the right [to counsel he] had invoked."[21] Moreover, there was no interrogation at this time.[22] McDougal summoned the detectives to voluntarily complain about his co-indictee, and in the process he incriminated himself. There were no threats or promises made; the detectives simply asked McDougal to explain why he had asked to see them. Detective Lee's comment about a witness was made in response to McDougal's assertion about Johnson and, when viewed objectively, does not appear to have been calculated to elicit an incriminating response. Therefore, we conclude that McDougal's May 19 statement was not the result of interrogation and is admissible at trial.[23]

*Judgment affirmed in part and reversed in part. All the Justices concur.*

DECIDED JANUARY 12, 2004.

*Mitchell D. Durham, Marc D. Cella*, for appellant.
*Patrick H. Head*, District Attorney, *Dana J. Norman, Russell J. Parker, Laura J. Murphree*, Assistant District Attorneys, *Thurbert E. Baker*, Attorney General, *Madonna M. Heinemeyer*, Assistant Attorney General, for appellee.

---

[20] The remainder of this conversation consists solely of Detective Lee castigating McDougal for his alleged lack of remorse, and is not admissible.

[21] *Ottis v. State*, 269 Ga. 151, 154 (2) (496 SE2d 264) (1998).

[22] See id. at 153-154 (2); *Walton*, supra at 717-718 (4); *Rhode Island v. Innis*, supra.

[23] Id.