A04A1022. JONES v. THE STATE.
(606 SE2d 288)

ADAMS, Judge.

Mac Derick Jones appeals following his convictions on one count of armed robbery, two counts of theft by taking and two counts of possession of a firearm during the commission of a felony. We affirm in part and reverse in part.

On December 27, 1999, Jones contacted Julia Ann Moss, who lived in Greene County, about a favor he wanted her to perform for him and asked her to meet him in Athens. Reluctantly, Moss did so. They drove to the residence of Darrel Lester, where Jones was staying and which was near the Suburban Lodge motel. After they arrived, Moss learned that Jones and Lester planned to rob the motel. Jones and Moss then rode together to the Suburban Lodge in her white 1991 Acura Integra. Lester drove there in another car to act as "lookout." Jones was wearing a ski mask, blue jeans, tennis shoes and a dark blue jacket.

---

Matthew Dion, a full-time University of Georgia student, was working as a desk clerk at the Suburban Lodge that night. He was sitting in the back room, when he heard the door slam open. Dion looked into the lobby and saw a man wearing a ski mask with a gun in his hand. The man demanded that Dion show him where the money was kept. Dion, who said he was "shocked and extremely frightened," indicated the cash register. The man took $200 to $300, dropping some money as he fled. Dion then saw a white Acura Integra leaving the parking lot. Moss testified that after Jones robbed the Suburban Lodge, he got into Moss's Integra and they drove to Lester's residence.

Officers from the Athens-Clarke County Police Department responded to the report of an armed robbery at the motel. Dion described the robber to police as being about 5 feet 10 inches tall and wearing an older tan-colored jacket which was ripped, but he could not identify the perpetrator.

Moss testified that the next day, Lester talked about committing another armed robbery. She overheard Lester talking to someone on the phone, who purportedly worked at the Local Finance Company in Athens. Lester then told Jones and Moss that he had "set up" the situation at the finance company with one of the employees. Moss drove Jones downtown in search of the Local Finance office, followed by Lester in a separate car. Jones was wearing the same mask and clothing as he had worn the night before at the Suburban Lodge. He carried the same gun. Jones then entered the Local Finance office.

Patricia Buntin, the manager of Local Finance, testified that at around 3:30 p.m. on December 28, a man came into the office just as they were about to close. The man pulled a mask over his face as he walked in. He walked over to another employee, Mildred Little, placed the gun on the counter and demanded that Little give him the money. The man gave Little a blue bag and told her to put the money in it. Little testified that she thought the man was going to shoot her because he put the gun in her face. The man took approximately $500. Moss testified that Jones came out of the Local Finance office and jumped into her car. Jones and Moss then drove back to Lester's house.

Afterward, a third Local Finance employee, Vanessa Jennings, ran to the door and yelled that there had been a robbery. Corbi Sanders, an employee of Northeast Sales, was passing by when he saw Jennings crying and saying that she had been robbed. He observed a man in a dark-colored jacket and a dark-colored hat, carrying a bag. The man jumped into a white Acura Integra, and the car drove off.

Police received no further information until June 2001, when Detective Chris Guest, the lead investigator, received a call from Lester, who was then an inmate in the Madison County jail and who

offered to provide information about the robberies. Lester gave Guest the name of Moss, who was then an inmate at the Franklin County jail on an unrelated probation violation. Guest met with Moss and promised her immunity if she agreed to testify about Jones' and Lester's participation in the robberies.

A short time later Guest attempted to contact Jones. He learned that Jones was at work and left a message for him to call. Jones called Guest when he got home from work. After Guest told him that his name had come up in connection with a crime, Jones offered to talk to the detective that day. Guest asked Jones to come to the police department and he agreed.

When Jones arrived at the police station, he was met by Guest and Lieutenant Mark Durham. Jones asked Guest if he was under arrest and if he was going to jail. Guest replied in the negative. At the time, no warrants had been issued against Jones. Guest told Jones in advance that the questioning would be recorded, and the questioning occurred in Durham's office. Jones raised no objections to the recording. Guest testified that Jones was very polite and cooperative. The officers did not read Jones his *Miranda* rights prior to questioning him.

During questioning, Jones told detectives that Lester had come up with the idea of robbing the Suburban Lodge. Jones said that he had entered the motel, wearing a stocking mask and holding a gun. He showed the gun to the clerk and asked for money. Jones said he took money out of the cash register, but he was shaking so much that he dropped some of the money on the way out.

Jones also admitted going to rob Local Finance the next day. He said that he went in, placed the gun on the counter, handed one of the employees a blue plastic bag, and told her to fill it up. Jones said that he was wearing the exact same clothing he had worn the day before at the Suburban Lodge. Another employee filled the bag with money, approximately $600-$700, and Jones left. He gave $100 of the money to Moss and the rest to Lester when they returned to Lester's house. Subsequently, Jones and Lester got into a fight, and Jones had not seen Lester since.

Jones was allowed to leave at the conclusion of the interview, which lasted around 90 minutes. He was arrested over a week after the interview.

1. Jones asserts that the trial court erred in admitting his pre-trial statement because he was never read his *Miranda* rights although he was in police custody and because the statement was induced by police by the hope of benefit.

(a) In order to determine whether Jones was in custody at the time of his questioning, we apply an objective standard, considering all the surrounding circumstances:

[T]he determination of whether one is in custody depends upon the objective circumstances attending the particular interrogation at issue, and not upon the subjective views of either the person being interrogated or the interrogating officer. Put another way, the relevant inquiry in determining whether one is in custody is how a reasonable person in the suspect's position would perceive his or her situation.

(Footnote omitted.) *Hardin v. State*, 269 Ga. 1, 3 (2) (494 SE2d 647) (1998).

Here, the entire custodial interview was recorded, and after reviewing the tape the trial judge found that Jones's interrogation was not custodial in nature, noting in particular that Jones came to the police station voluntarily and was allowed to leave once the questioning was finished. The trial court's conclusion that Jones was not in custody for purposes of *Miranda* at the time he gave his statement is supported by the record, and we find that Jones's statement was properly admitted into evidence. See *Henley v. State*, 277 Ga. 818, 819-820 (2) (596 SE2d 578) (2004); *Hightower v. State*, 272 Ga. 42, 43 (2) (526 SE2d 836) (2000).

The facts of this case are distinguishable from the situation in *McDougal v. State*, 277 Ga. 493, 497-498 (1) (A) (591 SE2d 788) (2004), upon which Jones relies. In that case, the defendant agreed to accompany police back to the police station. When they arrived at the station, the defendant was led through two locked doors into a secure interview room. The defendant first attempted to avoid the officers' questions about a gun by stating that he was a convicted felon. And when he was confronted about his recent possession of a gun, the officers told him that he could be arrested for that possession. The officers specifically stated that they had enough evidence to detain the defendant, and made no commitments about whether he would be arrested. The officers also told him that he was not going to be released in time to make a previously scheduled appointment. Id. Based upon these facts, the Supreme Court of Georgia concluded that a reasonable person in the defendant's position would have believed that he was not free to leave. Id. at 498 (1) (A).

Here, in contrast, although the officers considered going to Jones's place of employment to speak with him, they allowed Jones to contact them. He came to the station voluntarily. Jones was told at the outset that he was not under arrest, and the evidence showed that there were no pending warrants against him. In fact, the officers told Jones that he would be going home after the interview. The interview was held in Durham's office, not in a secured interview room, and there is no evidence of any locked doors. Jones was cooperative, and, unlike the defendant in *McDougal*, he never asked to stop the

interview or to leave. Although Jones points to Durham's statement at the beginning of the interview that they "didn't want to . . . run . . . to the courthouse . . . to issue no warrant" as evidence that he was in custody, that statement is ambiguous at best and falls far short of the officer's representations in *McDougal*, that they had enough evidence to arrest him.

Based upon these facts, we find no error because a reasonable person in Jones's position "would have concluded that he was not under formal arrest and that his freedom was not restrained to the extent associated therewith." *Hightower*, 272 Ga. at 43 (2).

(b) Jones also asserts that his statement should have been excluded because it was induced by the hope of benefit in violation of OCGA § 24-3-50.

"The promise of a benefit that will render a confession involuntary under OCGA § 24-3-50 must relate to the charge or sentence facing the suspect. The phrase 'hope of benefit' generally means the reward of a lighter sentence." (Citation and punctuation omitted.) *Smith v. State*, 269 Ga. App. 133, 140 (3) (603 SE2d 445) (2004). Jones asserts that the officers' statement that they did not want to get a warrant and their praise of his efforts at turning his life around led him to believe that he might not be charged because he was cooperating with them. But at one point during the interview, Jones asked the detectives if they would promise that he would not go to prison in connection with the robberies. Officer Guest responded, "I'm not allowed to make promise [sic] — all — all I can do is say look, this man is on the straight and narrow. He's straightened his life out. You know, I — I'm giving you a chance right now to tell me your side of it. That's all — you know — you know we know what we're talking about." Guest then states, "When you leave out of here and you tell us about it, you're going to feel a lot better. You know what I'm saying?"

Thus, the officers made no promise to Jones that he would not go to jail. In fact, they said they could make no such promise. Nor was there any representation that he might receive a lighter sentence. They only indicated that they would note his cooperation and his efforts to straighten his life out. We find no violation of OCGA § 24-3-50. See *Jones v. State*, 266 Ga. App. 717, 720 (598 SE2d 366) (2004); *Porter v. State*, 264 Ga. App. 526, 530 (3) (591 SE2d 436) (2003).

2. Jones next contends that the trial court erred in allowing as impeachment evidence a portion of his pre-trial statement to police admitting participation in another crime.

"A defendant, like any other witness, may be impeached 'by disproving the facts testified to by him.' OCGA § 24-9-82." *Vehaun v. State*, 244 Ga. App. 136, 137 (2) (534 SE2d 873) (2000). Jones testified at trial that he robbed the motel and the finance company because he

thought that Lester was going to hurt him or kill him if he did not commit the robberies. He explained that ordinarily he "would never do anything like that. It's not me to — I just feel really bad for the people that were involved, and I just want to tell them that I'm sorry. That wasn't me. I mean, he made me do it." He said that he felt his life was in danger and that he "had to do it."

In response, the state sought to introduce a portion of Jones's pre-trial statement admitting that he and Lester had burglarized Lester's employer, a concrete company. The trial court had earlier ordered that portion of the statement redacted. The trial court ruled that although Jones's testimony had not placed his character into evidence, the state could admit a limited portion of his statement regarding this burglary to rebut his specific testimony that he committed the robberies only because Lester coerced him.

Such evidence was properly admitted, even though it reflected negatively on Jones's character, because it rebutted his prior testimony. See *St. Romaine v. State*, 251 Ga. App. 212, 213-214 (1) (554 SE2d 505) (2001); *Height v. State*, 214 Ga. App. 570, 571 (1) (448 SE2d 726) (1994). But even if it were error to admit such evidence, any error would be harmless in light of the other evidence at trial. *Height*, 214 Ga. App. at 571 (1).

3. Jones further contends that the trial court erred in failing to grant his motion for directed verdict of acquittal as to Count 5 of the indictment for possession of a firearm during the commission of a felony. The verdict form indicates that this count was based upon Jones's conviction of theft by taking at Local Finance. Jones asserts that because the state failed to prove the amount of money taken during that robbery, his convictions for theft by taking must be considered misdemeanors and thus cannot support his conviction under Count 5.

Jones raised this ground in his motion for new trial below, and the state conceded that the theft by taking relied upon by the jury in Count 5 was a misdemeanor. The trial court then entered a finding that the theft by taking must be considered a misdemeanor and vacated Jones's sentence on Count 5. After Jones filed this appeal, the trial court entered a subsequent order stating that its original order on the motion for new trial had made an implicit finding that the evidence was insufficient to support Jones's conviction on Count 5 for possession of a firearm during the commission of a felony, but the court had failed to vacate that conviction. The trial court then made its earlier ruling explicit by vacating Jones's conviction under Count 5. Because this order was issued after the filing of the notice of appeal, however, the trial court was without authority to modify, supplement or vacate its prior judgment and the order is a nullity. *In the Interest of R. W.*, 186 Ga. App. 885 (1) (368 SE2d 824) (1988).

Nevertheless, in light of the state's concession below, it is clear that Jones's conviction under Count 5 for possession of a firearm during the commission of a felony is not authorized by the evidence. *Harrison v. State*, 213 Ga. App. 366, 368 (3) (444 SE2d 613) (1994). Accordingly, the conviction on that count is reversed.

*Judgment affirmed in part and reversed in part. Ruffin, P. J., and Eldridge, J., concur.*

DECIDED OCTOBER 29, 2004.

*Vicki E. Carter*, for appellant.

*Kenneth W. Mauldin, District Attorney, John M. Chenhall, Assistant District Attorney*, for appellee.