**SECOND DIVISION
MCFADDEN, C. J.,
MILLER, P. J., and MERCIER, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 23, 2020**

# In the Court of Appeals of Georgia

A20A0450. CASTRO-MORAN v. THE STATE.

MILLER, Presiding Judge.

Following a jury trial, Catarina Castro-Moran was found guilty of second degree murder and cruelty to children in the second degree, and the trial court imposed a 10-year prison sentence. Castro-Moran appeals from the denial of her motion for new trial, arguing that (1) the trial court erred in refusing to charge the jury on reckless conduct and involuntary manslaughter; and (2) the trial court erred in admitting her statements to police into evidence at trial. We conclude that the trial court erred in failing to charge the jury on reckless conduct and involuntary manslaughter, however the trial court did not err by admitting Castro-Moran's statements to police into evidence at trial. We therefore affirm in part and reverse in part.

Viewed in the light most favorable to the verdict,[1] the record shows that Amanda "Marie" Santos occasionally took care of Yessica, who was Castro-Moran's 17-month-old daughter. While at a store with Yessica and Castro-Moran on December 26, 2015, Santos noticed that Yessica had a fever, and she told Castro-Moran to give Yessica Tylenol. Two days later, Castro-Moran told Santos that Yessica was still sick. Santos recommended that Castro-Moran take Yessica to a pediatrician or to the health department. Around the same time, Castro-Moran's neighbor observed Yessica as she spoke with Castro-Moran, and she told Castro-Moran that Yessica "looked sick." Also around the same time, Castro-Moran's roommate, Gustavo Perez, noticed that Yessica was ill. Castro-Moran told him that Yessica had a fever, and he told her to take Yessica to the hospital.

Castro-Moran later took Yessica to the health department. A nurse practitioner evaluated Yessica based on Castro-Moran's complaint that Yessica had a fever, that she had blood in her nose, and that Yessica's last bowel movement had been "very hard." The nurse practitioner determined that Yessica was dehydrated and recommended that Yessica to be taken to the emergency room. Although Castro-

---

[1] *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

Moran took Yessica to the emergency room, she ultimately refused treatment for Yessica because of financial concerns, and she left the hospital with Yessica.

In the days that followed, Yessica continued to have a fever and Santos told Castro-Moran to take Yessica to a doctor. On December 31, 2015, Castro-Moran knocked on Perez's bedroom door and said, "I think my baby died." Perez ran to Castro-Moran's bedroom, saw Yessica lying in the bed with her eyes open, and called 911. He also performed CPR on Yessica after noticing that she was not breathing and had no pulse. While attending to Yessica, he noticed that she had a blister near her mouth, that her skin was pale, and that her eyes looked "stiff" as though "they had not moved in a long time."

Officers from the Dalton Police Department responded to the home and observed that Yessica was not moving, that her lip was blue, and that her eyes were dilated. One of the officers also administered CPR to Yessica and noticed that her arms and legs were stiff, which led the officer to believe that Yessica had been "deceased for some time." EMS later arrived and took Yessica to a hospital, where hospital personnel declared Yessica deceased. An autopsy determined that the cause of Yessica's death was an infection, staphylococcus aureus sepsis, which was

3

"complicated" by her lack of white blood cells. Congenital adrenal hyperplasia, an abnormality in Yessica's steroid hormones, also contributed to her death.

Castro-Moran was indicted on one count of felony murder (OCGA § 16-5-1 (c)) and one count of cruelty to children in the first degree (OCGA § 16-5-70 (b)). The jury found Castro-Moran guilty of the lesser included offenses of second degree murder and cruelty to children in the second degree.[2] The trial court merged the cruelty to children in the second degree conviction with the second degree murder conviction and sentenced Castro-Moran to ten years' imprisonment. Castro-Moran filed a motion for new trial, which the trial court denied. This appeal followed.

1. First, Castro-Moran argues that the trial court erred by refusing to charge the jury on reckless conduct as a lesser offense of cruelty to children in the first degree, and erred by failing to charge the jury on involuntary manslaughter as a lesser included offense of felony murder.

---

[2] Although Castro-Moran was convicted of second degree murder, disposition is proper in this Court because the maximum sentence is 30 years. See OCGA 16-5-1 (e) (1).

(a) As to Castro-Moran's claim regarding the trial court's refusal to charge on involuntary manslaughter as a lesser included offense of felony murder, we agree that the trial court erred by failing to charge the jury in this regard.

"We review a trial court's refusal to give a requested jury charge only for an abuse of discretion. (Citation omitted.) *Sachtjen v. State*, 340 Ga. App. 612, 615 (2) (798 SE2d 114) (2017).

> A written request to charge a lesser included offense must always be given if there is any evidence that the defendant is guilty of the lesser included offense. The evidence that the defendant committed the lesser offense does not need to be persuasive, but it must exist. A trial court is justified in refusing to charge on the lesser offense where there is no evidence that the defendant committed a lesser offense.

(Citations and punctuation omitted.) *Soto v. State*, 303 Ga. 517, 520 (2) (813 SE2d 343) (2018).

Here, Castro-Moran submitted a written request that the jury be charged on involuntary manslaughter predicated on reckless conduct as a lesser included offense of felony murder.[3] "A person commits the offense of involuntary manslaughter in the

---

[3] "[I]nvoluntary manslaughter and reckless conduct are both lesser included offenses of felony murder[.]" *State v. Springer*, 297 Ga. 376, 377 (1) (774 SE2d 106) (2015).

5

commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." OCGA § 16-5-3 (a).

> In this regard, a person may be found guilty of misdemeanor reckless conduct when he or she causes bodily harm to or endangers the bodily safety of another person by consciously disregarding a substantial and unjustifiable risk that his [or her] act or omission will cause harm or endanger the safety of the other person and the disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.

(Citation omitted.) *Seabolt v. Norris*, 298 Ga. 583, 585-586 (2) (783 SE2d 913) (2016).

Based on the trial record before us, we conclude that there was some evidence that Castro-Moran was guilty of the lesser included offense of involuntary manslaughter, and thus the trial court erred by failing to charge the jury in this regard. A nurse practitioner at the health department who initially examined Yessica testified that she told Castro-Moran that, based on her observations, Yessica was dehydrated and that she "really needed to go to the emergency room." Although Castro-Moran took Yessica to the emergency room, she refused treatment for Yessica because of financial concerns. Based on this evidence, a jury could have reasonably concluded

6

that Castro-Moran endangered Yessica by consciously disregarding a substantial and unjustifiable risk that her failure to seek medical treatment for Yessica would endanger her and lead to her death. See *Evans v. State*, 346 Ga. App. 739, 744-745 (1) (816 SE2d 843) (2018) (physical precedent only) (affirming the defendant's conviction for involuntary manslaughter where the evidence showed that the jail supervisor failed to provide proper medical care and treatment for the victim which led to the victim's death). Therefore, because there was some evidence to establish involuntary manslaughter predicated upon reckless conduct, the trial court should have charged the jury in this regard. See *Seabolt*, supra, 298 Ga. at 585-586 (2) (holding that the trial court erred by failing to charge jury on involuntary manslaughter where a jury could have reasonably concluded that the defendant acted with reckless conduct which caused the victim's death).

Nevertheless, the State argues that the trial court was not required to charge the jury on involuntary manslaughter because the evidence adduced at trial showed that Castro-Moran was guilty of the "completed" offense of felony murder predicated on cruelty to children in the first degree. This argument, however, is unavailing. While we have held that, "if the evidence shows the completed offense, as charged, or no offense, the trial court is not required to charge the jury on the lesser included

offense[,]" we have also been clear that "[w]here a case contains some evidence, no matter how slight, that shows that the defendant committed a lesser offense, then the court should charge the jury on that offense." (Citation omitted.) *Brinson v. State*, 245 Ga. App. 411, 413 (2) (537 SE2d 795) (2000). There was at least slight evidence at trial which showed that Castro-Moran was guilty of the lesser included offense of involuntary manslaughter predicated on reckless conduct, and the trial court therefore erred by refusing to charge the jury in this regard.

We must next consider whether this instructional error was harmless. "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. And in determining whether such an error is harmless, we assess the evidence from the viewpoint of reasonable jurors, not in the light most favorable to the verdicts." (Citations and punctuation omitted.) *Henry v. State*, 307 Ga. 140, 146 (2) (c) (834 SE2d 861) (2019).

We conclude that the failure to charge the jury on involuntary manslaughter was not harmless. Although the trial court charged the jury on the State's request for the lesser included offense of second degree murder[4] of which Castro-Moran was

---

[4] "A person commits the offense of murder in the second degree when, in the commission of cruelty to children in the second degree, he or she causes the death of another human being irrespective of malice." OCGA § 16-5-1 (d).

ultimately convicted, we cannot say based on the evidence recounted above that the jury would have also rejected the lesser included offense of involuntary manslaughter predicated on reckless conduct had it been so charged. See *O'Shields v. State*, 351 Ga. App. 800, 806 (2) (833 SE2d 290) (2019) (holding that the trial court's failure to charge the jury on the defendant's request for a lesser included offense was not harmless where, although the defendant was acquitted of the greater offense which was predicated upon other lesser offenses, it was unknown whether the jury would have also rejected the defendant's requested lesser included offense had it been so charged). Accordingly, the trial court's refusal to charge the jury on involuntary manslaughter predicated on reckless conduct was not harmless, and we therefore reverse Castro-Moran's conviction for second degree murder.[5]

(b) As to Castro-Moran's claim regarding the trial court's failure to charge the jury on reckless conduct as a lesser included offense of cruelty to children in the first degree, we note that the trial court merged her conviction for cruelty to children in the second degree with her conviction for second degree murder. Because we reverse Castro-Moran's conviction for second degree murder however, her guilty verdict for

---

[5] Because the evidence recounted above was sufficient to support the conviction[], the State may retry [Castro-Moran] if it chooses." (Citation omitted.) *O'Shields*, supra, 351 Ga. App. at 806 (2).

second degree cruelty to children is "unmerged" from her conviction for second degree murder. See *Harris v. State*, 286 Ga. 245, 253 (8) (686 SE2d 777) (2009) (holding that the defendant's conviction on one charge had "unmerged" from a conviction that was reversed on appeal). Thus, it stands to reason that if the second degree cruelty to children verdict is permitted, the trial court would be authorized on remand to enter a judgment and impose sentence for that conviction. See id. (instructing the trial court to impose a sentence on an offense "unmerged" from a conviction which was reversed on appeal). Also, it is well settled that "if a defendant raises an issue on appeal that, on remand, would bar entry of a conviction on a verdict that was merged or vacated, it is appropriate to address that issue." (Citation omitted.) *Wright v. State*, 338 Ga. App. 216, 225 (2) (789 SE2d 424) (2016). Accordingly, we address Castro-Moran's claim regarding the trial court's failure to instruct the jury on reckless conduct as a lesser offense of cruelty to children.

"[R]eckless conduct may be a lesser included offense of cruelty to children, if the harm to the child resulted from criminal negligence rather than malicious or willful conduct." (Citation and punctuation omitted.) *Shah v. State*, 300 Ga. 14, 19 (2) (793 SE2d 81) (2016). For the reasons provided in Division (1) (a), there was some evidence establishing Castro-Moran's guilt for reckless conduct. Accordingly,

10

we conclude that the trial court erred by failing to charge the jury on reckless conduct as a lesser offense of cruelty to children, and thus Castro-Moran's conviction for that offense cannot be sustained. See *Allaben v. State*, 294 Ga. 315, 322 (2) (b) (2) (751 SE2d 802) (2013), overruled on other grounds by *State v. Springer*, 297 Ga. 376 (774 SE2d 106) (2015) (setting aside guilty verdicts for convictions that became unmerged upon reversal of the defendant's murder conviction).

2. Next, Castro-Moran argues that the trial court erred by admitting her statements to police into evidence at trial.[6] We conclude that the trial court properly admitted Castro-Moran's statements into evidence because she was not in custody for purposes of *Miranda*.[7]

> When the facts material to a motion to suppress are disputed, it generally is for the trial judge to resolve those disputes and determine the material facts. An appellate court must (1) accept a trial court's findings unless they are clearly erroneous, (2) construe the evidentiary record in the light most favorable to the factual findings and judgment of the trial court, and (3) limit its consideration of the disputed facts to those expressly found by the trial court. However, an appellate court may also consider facts that definitively can be ascertained exclusively by

---

[6] Because this issue is likely to occur on retrial, we will address this enumeration of error.

[7] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

11

reference to evidence that is uncontradicted and presents no questions of credibility, such as facts indisputably discernible from a videotape. And we review de novo the trial court's application of law to the undisputed facts.

(Citations and punctuation omitted.) *State v. Andrade*, 342 Ga. App. 228, 228-229 (803 SE2d 118) (2017).

It is well settled that "*Miranda* warnings are required when a person is interviewed by an investigating officer while in custody." (Citation omitted.) *Chavez-Ortega v. State*, 331 Ga. App. 500, 502 (1) (771 SE2d 179) (2015).

To determine if an individual is in custody for purposes of *Miranda*, courts must inquire into whether that person's freedom of movement was restrained to a degree associated with a formal arrest. This inquiry involves an examination of the circumstances surrounding the questioning to determine whether a reasonable person would have felt at liberty to terminate the interrogation and leave.

(Citation omitted.) *Vaughn v. State*, 282 Ga. 99, 102 (4) (646 SE2d 212) (2007). "Whether a suspect is in custody does not depend upon the subjective views harbored by either the interrogating officers or the person being questioned. Instead, the only relevant inquiry is how a reasonable person in the suspect's position would have

understood the situation." (Citation and punctuation omitted.) *Chavez-Ortega*, supra, 331 Ga. App. at 503 (1).

Here, an officer from the Dalton Police Department testified that he responded to the hospital after Yessica's death and met with Castro-Moran in one of the hospital's waiting rooms. Initially, the officer was accompanied by another officer who served as a translator, along with the coroner and a nurse. While speaking with Castro-Moran at the hospital, the officer told her that she was not under arrest. The officer also testified that he did not use any restraints on Castro-Moran, nor did he threaten her or make any promises to her in exchange for her speaking with him. After speaking with Castro-Moran at the hospital for approximately 35 minutes, the officer asked Castro-Moran to go to the police station for a follow-up interview.

The police drove Castro-Moran to the station and took her to an interview room. While in the interview room, Castro-Moran was not restrained, and the officer told Castro-Moran that she was not under arrest and that it "was her choice to talk to [them] and give her statement." The officer again told her that she was not under arrest, and he proceeded to advise her of her *Miranda* rights, which were translated and provided to her Spanish. Castro-Moran was advised several times that it was her choice as to whether she desired to speak with him, and she was also told that she was

13

not being "tricked" in any manner." At one point, Castro-Moran mentioned the *possibility* of speaking with a lawyer, and an officer informed Castro-Moran that she did not have to speak with them and that it was her choice whether she wanted to continue with the interview.[8]

We conclude, based on the totality of the circumstances, that Castro-Moran was not in custody for purposes of *Miranda*. The record is clear that Castro-Moran went willingly with the police to the police station to speak with the officers, that she was not restrained at any point during the interview, and that she was advised on several occasions that she was not under arrest and that she did not have to speak with them. Additionally, the fact that the officer advised Castro-Moran of her *Miranda* rights did not transform the interview into a custodial interrogation. See *Licata v. State*, 305 Ga. 498, 501 (1) (826 SE2d 94) (2019) ("The reading of *Miranda* warnings is another factor to consider, but those warnings alone do not transform a noncustodial interrogation into a custodial one."). Although Castro-Moran told the officers that she would speak with them because she could not afford a lawyer, the officers immediately responded by again informing her that she did not have to speak with

---

[8] Notably, Castro-Moran left the room and went into the hallway for approximately 40 minutes at one point during the interview.

them and that she was "not in trouble."[9] Furthermore, to the extent that Castro-Moran

argues that she did not understand the *Miranda* warnings, the record is clear that after

being advised of her rights in Spanish, both orally and in writing, Castro-Moran told

the officers that she would speak with them because she wanted to "put everything

behind [her]." Accordingly, the trial court properly admitted Castro-Moran's

statements into evidence at trial.[10] See *Drake v. State*, 296 Ga. 286, 289-290 (2) (766

SE2d 447) (2014) (holding that the defendant was not in custody for purposes of

*Miranda* where the record showed that the defendant willingly went to the police

---

[9] To the extent that Castro-Moran uses this discussion with the officers to argue that she unambiguously invoked her right to counsel, her argument fails. After Castro-Moran mentioned the possibility of speaking with a lawyer, she changed her mind shortly thereafter and agreed to speak with the officers. See *Johnson v. State*, 289 Ga. App. 41, 43 (656 SE2d 200) (2007) (holding that the defendant did not unequivocally request counsel where although the defendant initially told the officers that he wanted to call his family attorney, he then told the officers "we can wait until after this is done."). Thus, Castro-Moran's reliance on *Smith v. Illinois*, 469 U. S. 91 (105 SCt 490, 83 LE2d 488) (1984) necessarily fails.

[10] Castro-Moran's reliance on *McDougal v. State*, 277 Ga. 493 (591 SE2d 788) (2004) is greatly misplaced. In that case, the Supreme Court of Georgia held that the defendant was in custody for *Miranda* purposes because the officers told the defendant that they did not have to let him go because they already had enough evidence, and also told the defendant that they would not release him in time for him to keep an appointment. Id. at 497-498 (1) (A).

15

station to speak with the officers, the defendant was not threatened or physically restrained, and was told that he was not under arrest).

In sum, the trial court did not err by admitting Castro-Moran's statements to police into evidence at trial, but the trial court erred by refusing to charge the jury on involuntary manslaughter and reckless conduct and we therefore reverse Castro-Moran's conviction for second degree murder.

*Judgment affirmed in part and reversed in part. McFadden, C. J., and Mercier, J., concur.*