306 Ga. 29
FINAL COPY

S19A0095.  DOZIER v. THE STATE.

WARREN, Justice.

Keith Anthony Dozier was convicted of malice murder, aggravated assault, and theft by taking in connection with the death of Gail Spencer.[1]  On appeal, Dozier contends that the trial court

---

[1] The murder was committed on October 5, 2012.  On July 9, 2013, a Bibb County grand jury indicted Dozier, Tracy Jones, Michael Brett Kelly, and Courtney Kelly for malice murder (Count 1); three counts of felony murder predicated on aggravated assault (Count 2), burglary in the first degree (Count 3), false imprisonment (Count 4); aggravated assault (with a handgun) (Count 5); burglary in the first degree (Count 6); false imprisonment (Count 7); and theft by taking (Count 8).  Michael Brett Kelly was also indicted for aggravated sodomy (Count 9).  At a separate trial held from May 26 to 28, 2015, a jury returned guilty verdicts against Dozier on all counts.  The trial court sentenced Dozier to serve life without parole for malice murder, 20 years consecutive for aggravated assault, and 20 years concurrent for theft by taking.  The three felony-murder counts were vacated by operation of law, and the trial court merged the remaining verdicts into the malice-murder conviction.  It appears that the trial court should not have merged the burglary and false imprisonment verdicts, *Johnson v. State*, 300 Ga. 665, 667 (797 SE2d 903) (2017) (false imprisonment); *Favors v. State*, 296 Ga. 842, 848 (770 SE2d 855) (2015) (burglary), but those rulings have not been challenged on appeal.  See *Dixon v. State*, 302 Ga. 691, 696-698 (808 SE2d 696) (2017).  Dozier filed a timely motion for a new trial on June 2, 2015, and an amended motion through new counsel on April 19, 2018.  The trial court held a hearing on May 31, 2018, and denied the motion as amended on June 12, 2018.  Dozier filed a timely notice of appeal on June 12, 2018, and the case was docketed in this Court for the term beginning in December 2018 and orally argued on December 10, 2018.

erred in sentencing him for felony theft by taking, failed to exercise its discretion when it sentenced Dozier to life without parole for the murder, erred when it recharged the jury on party to a crime, and erred in denying a motion to suppress his statement to police.[2] For the reasons that follow, we affirm all of Dozier's convictions except for his conviction of felony theft by taking, which we reverse and remand to the trial court with direction to enter a conviction and sentence for misdemeanor theft by taking under OCGA § 16-8-2.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed the following. Gail Spencer was an office manager for Calder Pinkston & Associates, a real-estate law firm, for about ten years.[3] Among other things, she oversaw real-estate closings and handled wire transfers. Dozier's co-indictee,

---

[2] On appeal, Dozier argued as "an initial matter," but not as an enumeration of error, that the trial court failed to rule on the general grounds in denying his motion for new trial and asked this Court to remand the case accordingly. Dozier later filed a supplemental brief withdrawing that argument.

[3] Spencer worked directly for Pinkston, for whom the law firm was also named.

Tracy Jones, worked for the firm as a secretary. Unlike Spencer, Jones did not have authority to handle wire transfers without permission, but she had been trained to complete wire transfers and had done so on specific occasions when authorized.

Some of Dozier's co-indictees devised a plan to hold Spencer hostage so that Jones could go in to work to wire money to the co-indictees — Tracy Jones, Michael Brett Kelly ("Brett"), and Courtney Kelly ("Courtney") — without Spencer's oversight. The group would then split the proceeds.[4]

On the morning of October 5, 2012, Jones, Brett, and Dozier drove to Spencer's home. Jones used a ruse to gain entry into Spencer's home, then sent a text message to Brett to come inside with Dozier; they entered wearing ski masks and gloves and ensured no one else was home. Jones left the house and texted Pinkston from Spencer's phone to say that Spencer was sick and would not be at work that day. Jones then went to work and transferred about $885,000 — separate transfers of $205,250, $429,550, and $249,750

---

[4] The record suggests that everyone but Dozier intended to flee to Canada after the money was transferred.

— from the firm's escrow account to three bank accounts held by Courtney.

Meanwhile, Brett — who brandished a pistol — and Dozier confronted Spencer and taped her to a chair. At some point, Brett sodomized Spencer and then suffocated her with a plastic bag while Dozier remained in the house as a lookout.[5] Around 4:00 p.m., Dozier and Brett left the house. Spencer had agreed earlier that morning to let her neighbors' dog into their house, and hours after Dozier and Brett left Spencer's house, those neighbors returned home to find the dog still outside. The neighbors became worried and checked on Spencer; after she did not answer her door, the neighbors called the police. The police forced entry into the home and found Spencer dead in her bed.

Once the money was transferred into Courtney's accounts, she fled without sharing the proceeds and left the rest of the group

---

[5] The evidence presented at trial showed that Brett's first attempt at suffocating Spencer with a pillow failed, at which point he left Spencer in the bedroom and talked with Dozier before going back in and killing Spencer with a plastic bag. The medical examiner testified that the cause of death was asphyxia.

unpaid. As a result, Jones executed two more wire transfers on October 9, 2012 — one for $245,000 and the other for $163,000 — from the firm's escrow account, bringing the total amount stolen to just under $1.3 million. Between October 5 (the date of the first transfers) and October 9 (the date of the second transfers), Dozier, Jones, and Brett met several times at Jones's apartment and visited multiple banks to open accounts they could use to receive the transfers. Meanwhile, investigators received a tip that led them to Brett, who led them to Jones and Dozier. On October 10, 2012, investigators read Dozier his *Miranda* rights, which he waived, and investigators interviewed him for approximately three hours. Though he initially denied involvement, he ultimately confessed to all charges except for sodomy and murder. Dozier claimed in the interview, and later testified at trial, that murdering Spencer was not part of the plan, that he tried to talk Brett out of it, and that he was coerced to stay in the house during Spencer's sodomy and murder.

Other than as to his conviction for felony theft by taking,

Dozier does not challenge the sufficiency of the evidence against him. Consistent with this Court's practice, however, we have independently reviewed the record and conclude that the evidence was sufficient to authorize a rational jury to find beyond a reasonable doubt that Dozier was guilty of the crimes of which he was convicted, other than the felony theft by taking. See *Jackson v. Virginia*, 443 U.S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979). As to the theft by taking, the State concedes that Dozier should have been convicted only of misdemeanor theft by taking, and considering the indictment, the evidence presented at trial, the jury instructions, and the verdict, we agree. Accordingly, we reverse the conviction for felony theft by taking and remand for the trial court to enter a judgment of conviction and impose a sentence for misdemeanor theft by taking as a lesser included offense under Count 8 of the indictment.

2. Dozier argues that the trial court failed to exercise its discretion when it sentenced him to life without parole for the murder conviction, thus requiring reversal of Dozier's sentence. We

disagree.

After Dozier was convicted on all counts at trial, the trial court stated at sentencing:

> I believe the law mandates a life without parole sentence. The law says if you have been convicted of a felony and you are subsequently convicted of another felony you have to be sentenced to the max. That's the max. But even if it's not mandated . . . the Court has the discretion to sentence you to life with parole or life without parole. *I will exercise my discretion* and sentence you to life without parole on count number one, malice murder.

(Emphasis supplied.) Even if the trial court mistakenly believed that it might be required to sentence Dozier to life without parole for murder as a recidivist under OCGA § 17-10-7 (a),[6] any error caused by its mistaken belief was harmless. That is because the record shows that the trial court *did* exercise its discretion in sentencing Dozier to life without parole. See *Hampton v. State*, 302 Ga. 166,

---

[6] See *Blackwell v. State*, 302 Ga. 820, 828-831 (809 SE2d 727) (2018) (rejecting argument that OCGA § 17-10-7 (a) requires a trial court to sentence a convicted felon to life imprisonment without the possibility of parole upon a subsequent murder conviction, and holding that OCGA § 17-10-7 (a) requires "the *longest* period of time *prescribed* for the subsequent offense") (emphasis in original).

172 (805 SE2d 902) (2017) (holding that any alleged error was harmless where "the trial court said that it thought that life without parole was the statutorily mandated sentence, but that it would have exercised its discretion to impose that sentence in any event"). Indeed, the trial court specifically stated at sentencing that it had the discretion to impose life without parole and was choosing to exercise that discretion — a point it reiterated twice in its order denying a motion for new trial. Accordingly, this enumeration of error fails.

3. Dozier contends that the trial court abused its discretion by recharging the jury on the theory of party to a crime without an accompanying instruction on mere presence, mere association, and knowledge, thereby overemphasizing the possibility of a conviction as a party to a crime. We disagree.

After approximately three hours of deliberations, the jury sent the court a note stating that it "would like to also clarify if in the indictments where it states he or she, is it only speaking of the physical person who did the crime." The court called the jury into

the courtroom to clarify its request, consulted with counsel for both parties, and concluded that the jury was confused about Count 8 of the indictment, which referenced "*her* fiduciary obligations" and about the concept of party to a crime. Over Dozier's objection, the court recharged the jury on party to a crime, providing the same pattern charge it initially had given the jury. It asked the jury whether the recharge had helped, and the foreman responded, "Yes. I believe that clarifies some of our concern."

"'A trial court has a duty to recharge the jury on issues for which the jury requests a recharge.'" *Barnes v. State*, 305 Ga. 18, 23 (823 SE2d 302) (2019) (citation omitted). When "the jury requests further instructions upon a particular phase of the case," however, "the court in (its) discretion may recharge them in full, or only upon the points requested." *Salahuddin v. State,* 277 Ga. 561, 564-565 (592 SE2d 410) (2004) (citation, punctuation and emphasis omitted). Moreover, "[o]ur case law contains no general mandate requiring trial courts, when responding to a jury's request for a recharge on a particular issue, to also recharge on all principles asserted in

connection with that issue." Id. at 564 (citation and punctuation omitted).

Here, the trial court discerned that the jury was confused about the legal theory of party to a crime. After acknowledging the jury's request for clarification and consulting with counsel for both parties, the trial court recharged the jury on party to the crime and even followed up by asking the jury if the recharge had helped. There is no indication that in recharging the jury, the trial court put undue emphasis on the party to the crime theory, and "nothing indicates that the jury was confused after the recharge or that the recharge left the jury with an erroneous impression of the law." *Barnes*, 305 Ga. at 23. The trial court did not abuse its discretion, and this enumeration of error fails.

4. Dozier claims that the trial court erred in denying his motion to suppress the statement he made to police while he was under arrest. Specifically, Dozier argues that (a) he invoked his right to remain silent; (b) he invoked his right to counsel at least twice; and (c) the totality of the circumstances show that his

statement to police was involuntary. We disagree.

Generally, when reviewing a trial court's ruling on a motion to suppress, this Court must accept the trial court's factual findings unless they are clearly erroneous. See *Drake v. State*, 296 Ga. 286, 288 (766 SE2d 447) (2014). However, when, as here, "[t]here is no dispute about what took place during the police interview in question, since it was recorded with both video and audio" and when "[t]he recording is part of the record on appeal, and the parties point to no evidence beyond the recorded interview to support their arguments regarding the admissibility of [a] confession," we "review de novo the trial court's determinations of both fact and law." *Brown v. State*, 290 Ga. 865, 868 (725 SE2d 320) (2012); see also *Johnson v. State*, 295 Ga. 421, 424 (761 SE2d 13) (2014).

(a) Dozier contends that the trial court erred when it determined that he did not invoke his right to remain silent during his interrogation when a detective asked Dozier, "Are we done?" and Dozier replied, "Yes, sir."

"[A]n accused may end a custodial interrogation at any time by

invoking his constitutional right to remain silent. To do so, a defendant must unambiguously and unequivocally express his desire to invoke that right" before officers are required to stop their questioning. *Barnes v. State*, 287 Ga. 423, 425 (696 SE2d 629) (2010); see also *Perez v. State*, 283 Ga. 196, 197-200 (657 SE2d 846) (2008); and *Berghuis v. Thompkins*, 560 U.S. 370, 381-382 (130 SCt 2250, 176 LE2d 1098) (2010). That determination depends on whether a defendant articulates a "desire to cut off questioning with sufficient clarity that a reasonable police officer in the circumstances would understand the statement to be an assertion of the right to remain silent." *Perez*, 283 Ga. at 200 (citation and punctuation omitted).

Here, the record shows that after waiving his *Miranda* rights, Dozier was interrogated by police. He initially denied any involvement in the crimes and asked to speak to his wife multiple times "to let her know where I'm at" and "what's going on." The detectives initially refused his requests. However, about 55 minutes into the interview, the detectives allowed Dozier to call his wife and

instructed him to use the speakerphone because the handset was broken; they then left the room.[7]   When detectives re-entered the room and continued the interrogation, Dozier continued to deny his involvement in the crimes.  Approximately one hour and fourteen minutes into the interview, Detective Shurley, who was apparently frustrated with Dozier's refusal to provide detectives with any new information that police had not already shared with Dozier, stated something that sounded like: "I'm done," and continued, "At this point you're being charged with murder.   You're gonna be transported to the Bibb County LEC." Detectives left the room, and Dozier called his wife again, this time saying that he was being charged with murder and taken to jail.  He stated, "I guess we're going to have to try to get a lawyer, baby"; asked her to look into a "paid attorney" or a court-appointed attorney; and remarked, "that's all I can do.  I have to get a lawyer."

A different detective, Chapman, entered to take over the interrogation and told Dozier that he wanted to give Dozier one last

---

[7] It is apparent from the record that detectives could hear Dozier's phone call.

chance to tell his side of the story. Dozier continued to deny his involvement in the crimes. Chapman told Dozier several times that he would leave if Dozier was not going to be honest. After additional questioning, Chapman — who was also apparently frustrated — said, "It's over buddy, have a good one ok. If you decide you know, whatever, I don't, I'm done alright. You good with that. I just gotta feel like I've done everything. You good, are we done here?" Dozier replied, "Yes, sir." Chapman left the room, and Dozier called his wife again. Detectives Shurley and Chapman re-entered the room while Dozier was on the phone, and — after they told Dozier that they would arrest his wife if she lied to them — Dozier admitted to being involved in the theft and to holding Spencer hostage, detailing what transpired inside the house during Spencer's murder.

Viewed in context, Dozier's response to Chapman's question was not an invocation of his right to remain silent, let alone an "unequivocal and unambiguous" one. See *Barnes*, 287 Ga. at 425. From the beginning, Detective Chapman used a strategy of giving Dozier an opportunity to explain his side of the story, and then

threatening to walk away when Dozier refused. Thus, when Chapman asked, "Are we done here?" and Dozier replied, "Yes, sir," it was reasonable for detectives to interpret that exchange as confirming that Chapman's further efforts would be pointless — not as Dozier invoking his right to remain silent. See *Barnes*, 287 Ga. at 425 (a "defendant's statement, 'if you're not going to talk real talk, then we shouldn't talk' was not an unequivocal and unambiguous invocation of his right to remain silent" and "lacked sufficient clarity to lead a reasonable police officer to understand that defendant was exercising his right to remain silent"); see also *Weaver v. State*, 288 Ga. 540, 544 (705 SE2d 627) (2011) (officer had no obligation to cease interrogation because defendant's statement "was part of the give and take of interrogation" and could be "reasonably understood to express" something other than an assertion of the right to remain silent) (citation and punctuation omitted). Because Dozier's response to Chapman's question was "plainly not an attempt to cut off questioning," id. (citation and punctuation omitted), the trial court did not err in denying Dozier's

motion to suppress on this ground.

(b) Dozier contends that the trial court erred when it found that Dozier did not invoke his right to counsel. Notably, Dozier does not argue that he invoked this right by making any kind of direct statement or request to the police who interrogated him. Instead, he contends that he asked his wife "to contact a lawyer at least twice during follow-up conversations with her," and that Dozier's statements to his wife amounted to an invocation of counsel because police could hear those phone conversations.

It is well established that "[a] suspect who asks for a lawyer at any time during a custodial interrogation may not be subjected to further questioning by law enforcement until an attorney has been made available or until the suspect reinitiates the conversation." *Kirby v. State*, 304 Ga. 472, 475 (819 SE2d 468) (2018) (citation and punctuation omitted). To invoke this right, however, a suspect must "'articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.'" Id.

(citation omitted). However, "the mere mention of the word 'attorney' or 'lawyer' without more, does not automatically invoke the right to counsel." *Reaves v. State*, 292 Ga. 582, 586 (740 SE2d 141) (2013) (citation and punctuation omitted). Moreover, "[e]ven a comment that a suspect would like counsel to be present in the future is not a clear and unambiguous request for counsel." Id. at 587. We have also held, however, that a suspect's statement that he wants to contact his wife so she may call his lawyer can constitute an invocation of the right to counsel. See *McDougal v. State*, 277 Ga. 493, 499 (591 SE2d 788) (2004) (holding that a defendant invoked his right to counsel when he stated that he "'would like to [call] my wife so she can call my lawyer'" before signing a *Miranda* waiver).

Here, the record confirms that Dozier mentioned a lawyer to his wife multiple times during the phone calls he made to her while he was in police custody. But these statements, unlike those in *McDougal*, were not an invocation of the right to counsel. 277 Ga. at 499. Indeed Dozier, unlike the defendant in *McDougal*, asked to

speak to his wife so that he could let her know "where I'm at, what was going on" — not so that she could contact an attorney. And at most, Dozier's statements to his wife were made to help secure "'the future assistance of an attorney, not immediate assistance.'" *Reaves*, 292 Ga. at 587 (citation omitted); see also *Dubose v. State*, 294 Ga. 579, 581-582 (755 SE2d 174) (2014). Because a reasonable officer would not have interpreted these statements as an invocation of Dozier's right to counsel, the trial court did not err when it denied Dozier's motion to suppress on this basis.

(c) Dozier contends that, under the totality of the circumstances, his statement to police was involuntary and that it therefore should have been suppressed. Specifically, he argues that the detectives' claim that they would arrest Dozier's wife if she lied to police amounted to coercion.

For a confession to be admissible, the State bears the burden of showing that it was made voluntarily. See *Welbon v. State*, 301 Ga. 106, 109 (799 SE2d 793) (2017); see also *Lego v. Twomey*, 404 U.S. 477, 489 (92 SCt 619, 30 LE2d 618) (1972). "In determining

whether a defendant's statement was voluntary as a matter of constitutional due process" we "must consider the totality of the circumstances." *Olevik v. State*, 302 Ga. 228, 248 (806 SE2d 505) (2017) (citation and punctuation omitted).  Coercive police activity—such as "excessively lengthy interrogation, physical deprivation, [and] brutality," *Price v. State*, 305 Ga. 608, 612 (825 SE2d 178) (2019) (citation and punctuation omitted) — "is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *State v. Troutman*, 300 Ga. 616, 618 (797 SE2d 72) (2017) (citation and punctuation omitted).

Here, the record lacks any evidence of the physical or mental hallmarks of coercive activity, despite Dozier's complaints about statements detectives made about arresting his wife.  With respect to those statements, the record shows that Detectives Shurley and Chapman re-entered the room during one of Dozier's phone calls to his wife and told her over the speakerphone that they would send an investigator to pick her up, stating to her:  "You say this man was

with you.  I'm willing to give you an opportunity to give that statement. . . . And if you wanna provide a statement saying that your husband was with you I'll document it for you on his behalf, ok."[8]  Chapman ended the call and told Dozier that he would arrest Dozier's wife if she lied about Dozier's whereabouts that morning — and that Chapman would know she was lying because police had video surveillance of Dozier arriving at Jones's apartment and leaving in Jones's car on the day of Spencer's murder.  Dozier asked for "ten minutes" to call his wife again and "another cigarette."  The detectives left the room and Dozier called his wife.  Among other things, he told her: "don't worry about" giving a statement; "I have to be a man and stand up for what I did"; and "I have to tell them the truth."  When detectives re-entered the room, Dozier admitted to being involved in the theft and to holding Spencer hostage, detailing what transpired inside the house during Spencer's murder.

Viewed in context and as part of all of the circumstances

---

[8] This statement appeared to be a strategic technique, because the record indicates that earlier in the day Dozier's wife had also already told detectives that she did not see Dozier the morning of the murder.

surrounding Dozier's interrogation, the detective's statement that he would arrest Dozier's wife if she lied about Dozier's whereabouts was a "'mere truism' and not the type of statement that would necessarily render a confession involuntary." See *State v. Davison*, 280 Ga. 84, 86 (623 SE2d 500) (2005) ("[I]t is not a coercive tactic for a police officer to threaten to arrest a person for committing a crime in his presence, as he is constitutionally authorized to do."). These tactics did "not rise to techniques and methods offensive to due process or create circumstances in which the suspect clearly had no opportunity to exercise a free and unconstrained will." *Troutman*, 300 Ga. at 619 (citation and punctuation omitted). Accordingly, the trial court did not err in denying Dozier's motion to suppress on the theory that Dozier's statement was involuntary, and his enumeration on this basis fails.

Judgment affirmed in part and reversed in part, and case remanded with direction. All the Justices concur.

Decided June 3, 2019.

Murder. Bibb Superior Court. Before Judge Simms.

Cara Clark, for appellant.

K. David Cooke, Jr., District Attorney, Shelley T. Milton, John A. Regan, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.