**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: August 21, 2023

S23A0710. BELTRAN-GONZALES v. THE STATE.

COLVIN, Justice.

Appellant Ricardo Beltran-Gonzales appeals his conviction for malice murder in connection with a stabbing at Hays State Prison, which resulted in the death of fellow inmate Nathaniel Reynolds.[1]

---

[1] The stabbing occurred on January 18, 2013. On July 8, 2013, a Chattooga County grand jury charged Appellant with malice murder, felony murder, and aggravated assault. Leonardo Ramos Rodrigues, whose case is not part of this appeal, was separately charged with the same crimes. On September 26, 2013, the State filed a notice of joint trial seeking to try Appellant together with Rodrigues. A joint jury trial was held from February 24 to 26, 2014. The jury found Appellant and Rodrigues guilty on all counts, and the court sentenced them both to serve life in prison for malice murder. The court merged Appellant's aggravated-assault and felony-murder charges into his malice murder charge for sentencing purposes, but the felony-murder charge was actually vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993). Appellant filed a motion for new trial on February 27, 2014, which he amended through new counsel on December 2, 2016. Following a hearing, the court issued a written order summarily denying the motion on October 2, 2018. Defense counsel did not timely file a direct appeal. On March 16, 2020, Appellant filed a pro se habeas petition, claiming that trial counsel was ineffective for failing to timely file a notice of appeal. On February 2, 2023, the habeas court granted Appellant

On appeal, Appellant contends that the trial court abused its discretion in recharging the jury on malice murder without also recharging the jury on Appellant's defenses. Appellant also argues that trial counsel was ineffective for failing to object to the State jointly trying Appellant with another inmate, Leonardo Ramos Rodrigues, who was separately charged with committing the same fatal stabbing. For the reasons explained below, we affirm Appellant's conviction.

1. The trial evidence showed the following. In September 2012, Reynolds and Rodrigues were inmates at Hays State Prison. The men, both of whom were assigned to the "C building" dormitory, had an altercation on September 6. As a result of the fight, Reynolds was taken out of the general population and segregated in the Special Management Unit ("SMU"). While Reynolds was in the SMU, Appellant arrived at Hays State Prison as a prisoner.

relief in the form of an out-of-time direct appeal. Pursuant to the habeas court's order, Appellant filed a notice of appeal in his criminal case directed to this Court. The appeal was docketed to this Court's April 2023 term and submitted for a decision on the briefs.

2

Eventually, Reynolds asked to be returned to the general population, and his request was granted in January 2013.

On January 18, 2013, Officers Nicholas Souther and Stefan Hoglund transported Reynolds from the SMU back to C building. When they arrived at C building, the officers exchanged paperwork with Officer Christopher Magness, who was the C building floor officer. Officer Andrew Liden, who was stationed in C building's control room, then saw Appellant "run past the dorm or the control room door with a sharp piece of metal in his hand" and "stab inmate Reynolds," before the men moved out of his line of sight. Meanwhile, Officers Souther, Hoglund, and Magness heard a commotion nearby. The officers testified that they turned to see Appellant and Rodrigues stabbing Reynolds with "prison made knives" made out of "sharpened pieces of metal," known as "prison shank[s]." Appellant, who had one prison shank, and Rodrigues, who had two prison shanks, cornered Reynolds and "t[ook] turns stabbing him" as Reynolds "tr[ied] to swat his hands to avoid the blades." Officer Daniel Keena, who was stationed at D building ran to the scene and

likewise witnessed the stabbing.

The officers radioed the code for an inmate fight with weapons. Shortly thereafter, Correctional Emergency Response Team Officer Matthew Kennedy ran to the scene, witnessing the stabbing in the process. He then yelled at Appellant and Rodrigues to stop and get down on the ground. Appellant laid down his weapon and put his hands over his head, but Rodrigues refused to comply with the instructions until Officer Kennedy administered pepper spray.

While officers secured the men, Reynolds collapsed on the ground. Reynolds died soon after. The State's medical examiner testified that Reynolds had ten incised wounds and seven stab wounds and had died from "[s]harp force trauma of the chest," which had "pierced the heart."

Rodrigues, who was a native Spanish speaker, testified in his own defense through an interpreter at trial. His testimony included a description of the incident that resulted in Reynolds being sent to the SMU. Rodrigues testified that he and others were watching a soap opera in Spanish when Reynolds approached the television and

changed the channel. An argument ensued. According to Rodrigues, he eventually left the room and went outside, but Reynolds followed him out and stabbed him in the back.

Rodrigues also admitted that he had killed Reynolds, but he claimed that he had acted in self-defense. Rodrigues testified that, after eating at the cafeteria, he returned to C building and found Reynolds standing outside. According to Rodrigues, he feared for his life because he knew Reynolds had previously threatened to "finish [Rodrigues] off," and, after the men made eye contact, Reynolds started "coming towards" Rodrigues while "put[ting] his hand in [his pants]" in an apparent attempt to retrieve a weapon. Rodrigues testified that he "didn't give [Reynolds] time" to pull out a weapon and instead "went toward" Reynolds, attacking Reynolds with two shanks. When asked about Appellant's involvement in Reynolds's killing, Rodrigues said, "The guilty one of [Reynolds's] murder is myself. [Appellant has] got nothing to do with this." Rodrigues further testified that he had not been friends with Appellant, that Appellant "wasn't even [at the prison] when

5

[Rodrigues and Reynolds] first had the problem," and that Rodrigues had acted alone in stabbing Reynolds.

Although opening statements and closing arguments were not transcribed, testimony at the motion-for-new-trial hearing revealed that Appellant's defense at trial was that he was mistakenly identified as a perpetrator of the stabbing.[2] The jury rejected Appellant's defense and found him guilty of the charges

2. Appellant argues that the trial court abused its discretion when, in response to a jury question about the law of malice murder, the court recharged the jury on malice murder without also recharging the jury on Appellant's defenses. We disagree.

At trial, the court instructed the jury on the State's burden to prove the identity of a defendant as the perpetrator of the alleged crime, the elements of malice murder, and the law regarding mutual combat and self-defense. During jury deliberations, the jury sent a

---

[2] Although the court charged the jury on mutual combat and justification, those defenses were not included in Appellant's written request for jury charges and the record does not suggest that Appellant argued those defenses.

6

note to the court stating, "We would like for you to read the law on malice murder again." The court proposed to counsel that it would "simply read the one definition," and Rodrigues asked the court to also recharge the jury on "the affirmative defenses." The court responded that it would ask the jurors if they wanted a recharge on other instructions and that the court would reread the instructions on "mutual combat" and the "affirmative defenses" if the jurors wanted more. The court then recharged the jury on malice murder and asked, "Does that answer your question or are there other portions of the charge that you would like for me to read as well?" The jury foreperson responded, "No, ma'am, that does it." The court then stated, "Now, let me just caution you, don't take this away from the rest of the charge[.] [T]he Court's charge should be taken as a whole. Everything I charged you in the original charge is equally as important." After the jury returned to deliberations, Rodrigues objected to the court's failure to recharge the jurors on "the defenses[,] . . . since we requested that," and Appellant joined the objection.

"A trial court has a duty to recharge the jury on issues for which the jury requests a recharge." *Flood v. State*, 311 Ga. 800, 806 (2) (b) (860 SE2d 731) (2021). "[O]ur case law contains no general mandate requiring trial courts, when responding to a jury's request for a recharge on a particular issue, to also recharge on all principles asserted in connection with that issue." *Dozier v. State*, 306 Ga. 29, 32-33 (3) (829 SE2d 131) (2019) (citation and punctuation omitted). Rather, when the jury does not request additional instructions, "the need, breadth, and formation of additional jury instructions are left to the sound discretion of the trial court." *Barnes v. State*, 305 Ga. 18, 23 (3) (823 SE2d 302) (2019) (citation and punctuation omitted)).

We discern no abuse of discretion in the trial court's decision to recharge the jury only on malice murder. Appellant argues that "the trial court maybe should have recharged the jury on the affirmative defenses [in addition to recharging the jury on malice murder], so as to not leave an erroneous impression in the minds of the jury." But the court directly responded to the jury's specific request that the court reread the malice-murder instruction, fulfilling its duty to

8

recharge the jury at the jury's request. See *Flood*, 311 Ga. at 806 (2)

(b). See also *Barnes*, 305 Ga. at 23 (3) ("[I]t was within the court's

discretion whether to recharge the jury in full or only upon the point

or points requested by the jury." (citation and punctuation omitted)).

In addition, the court took steps to ensure that the recharge would

not cause confusion or leave an erroneous impression in the minds

of the jurors. Specifically, the court confirmed that the recharge

answered the jury's question and that the jury did not want the court

to repeat any additional instructions. The court also directed the

jury to consider the court's instructions as a whole and not to put

undue emphasis on the recharge. Accordingly, this claim fails. See

*Dozier*, 306 Ga. at 33 (3) (no abuse of discretion where the court

"recharged the jury on party to the crime," the court "followed up by

asking the jury if the recharge had helped," and there was "no

indication that . . . the trial court put undue emphasis on the party

to a crime theory, . . . that the jury was confused after the recharge[,]

or that the recharge left the jury with an erroneous impression of

the law" (citation and punctuation omitted)). See also *Barnes*, 305

Ga. at 22-23 (3) (no abuse of discretion in recharging the jury only on malice murder, even where the court did not "ask[ ] the jury if its question [about what malice murder was] had been sufficiently answered," because "nothing indicate[d] that the jury was confused after the recharge or that the recharge left the jury with an erroneous impression of the law").

3. Appellant also argues that trial counsel was constitutionally ineffective for failing to object to the State trying Appellant jointly with Rodrigues. We are unpersuaded that trial counsel performed in a constitutionally deficient manner.

Before trial, the State filed a notice of joint trial, seeking to try Appellant and Rodrigues together, even though the men had been indicted separately. Defense counsel did not object, and the case proceeded to trial.

As described above, the trial evidence showed that Rodrigues and Reynolds had a prior altercation on September 6, 2012, which resulted in Reynolds being segregated in the SMU until the day of his death on January 18, 2013. The court instructed the jury that

10

this evidence could be considered only for the purpose of assessing "the state of feeling between the defendant and the alleged victim and the reasonableness of the alleged fears by the defendant Rodrigues."

In addition, the State introduced trial evidence, under OCGA § 24-4-404 (b) ("Rule 404 (b)"), that Rodrigues had pleaded guilty to involuntary manslaughter after stabbing a man in the chest in 2008. Before the State introduced the Rule 404 (b) evidence, the court instructed the jury that the evidence could "be considered only to the extent that it may show the intent that the State is required to prove in the crimes charged against Mr. Rodrigues in this case presently on trial" and not "for any other purpose." The court gave a similar instruction again at the conclusion of the case.

In his motion for new trial, Appellant claimed that trial counsel was ineffective for failing to object to the joint trial of Appellant and Rodrigues because the evidence that Rodrigues had a prior difficulty with Reynolds and had previously stabbed someone prejudiced Appellant's defense. Trial counsel was asked at the motion-for-new-

11

trial hearing whether he thought the evidence regarding Rodrigues's prior conviction created a "possibility" that the jury could hold Appellant "guilt[y] by association" and whether he had ever thought he should sever the trials. To both questions, trial counsel responded, "No." Trial counsel explained that he "wanted the jury to actually hear about Mr. Rodrigues'[s] conviction" because it was "very clear that [the conviction] just involved Mr. Rodrigues, not [Appellant]," and he "thought it was important . . . that the jury be able to compare [Appellant and Rodrigues] side by side," so the jurors could see that Rodrigues "ha[d] this history of violence" while Appellant "d[id] not." Trial counsel further testified that he believed this contrast between the defendants supported the defense theory, which was that Appellant "was [not] actually involved in this killing" committed by Rodrigues and had been mistakenly identified as a perpetrator when correctional officers, who were "dealing with a . . . large group of inmates, . . . plucked [Appellant] from the ground." The trial court summarily denied Appellant's motion for new trial.

To establish that trial counsel was constitutionally ineffective,

an appellant must "prove both deficient performance by counsel and resulting prejudice." *Evans v. State*, 315 Ga. 607, 611 (2) (b) (884 SE2d 334) (2023) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984)). To prove that trial counsel was deficient, an appellant "must demonstrate that his attorney performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Taylor v. State*, 315 Ga. 630, 647 (5) (b) (884 SE2d 346) (2023) (citation and punctuation omitted). There is "a strong presumption that counsel's representation was within the wide range of reasonable professional assistance." *Monroe v. State*, 315 Ga. 767, 781 (6) (884 SE2d 906) (2023) (citation and punctuation omitted). Overcoming that presumption requires an appellant to show "that no reasonable lawyer would have done what his lawyer did, or would have failed to do what his lawyer did not." *Evans*, 315 Ga. at 611 (2) (b) (citation and punctuation omitted). Further, "[w]hether to seek severance is a matter of trial strategy, and in the absence of evidence to the contrary, counsel's decisions are

presumed to be strategic and thus insufficient to support an ineffective assistance of counsel claim." *Lupoe v. State*, 300 Ga. 233, 241 (2) (c) (794 SE2d 67) (2016) (citations and punctuation omitted). Where an appellant fails to show deficient performance, this Court need not examine whether the appellant has established prejudice. See *Monroe*, 315 Ga. at 781 (6).

Here, Appellant has not shown that trial counsel performed deficiently in failing to object to the joint trial of Appellant and Rodrigues. As trial counsel testified at the motion-for-new-trial hearing, he strategically acquiesced in the joint trial of Appellant and Rodrigues, believing that a joint trial would benefit Appellant's mistaken-identification defense. Trial counsel reasoned that trying the men together would allow the jury to hear that Rodrigues had previously stabbed a man to death, and that such evidence supported an inference that Rodrigues, rather than Appellant, was the likely perpetrator of Reynolds's stabbing. Although trial counsel was not asked at the motion-for-new-trial hearing how the evidence regarding Rodrigues's prior difficulty with Reynolds impacted his

14

trial strategy, that evidence similarly supported the defense theory, showing that Rodrigues had a motive to stab Reynolds, while Appellant did not.

Appellant contends that it would have been "more beneficial" to sever the cases if trial counsel wanted the jury to distinguish between Appellant and Rodrigues. But "[t]he fact that present counsel would pursue a different strategy does not render trial counsel's strategy unreasonable." *Walker v. State*, 294 Ga. 752, 757 (2) (e) (755 SE2d 790) (2014) (citation and punctuation omitted). Further, although Appellant also asserts that the jury likely used the evidence of Rodrigues's prior difficulty and prior conviction against Appellant, the record does not support Appellant's contention. There was no evidence presented at trial suggesting that Appellant was involved in the prior altercation between Rodrigues and Reynolds, which occurred before Appellant arrived at the prison. Further, as trial counsel testified at the motion-for-new-trial hearing, it was "very clear" from the trial evidence that Appellant was not involved in the stabbing that resulted in

15

Rodrigues's prior conviction. Moreover, the trial court instructed the jury that evidence pertaining to Rodrigues's prior difficulty and prior conviction could be used only against Rodrigues. See *Charles v. State*, 315 Ga. 651, 660 (4) (884 SE2d 363) (2023) ("[T]he jury is presumed to follow the instructions of the trial court absent clear evidence to the contrary." (citation and punctuation omitted)).

Under the circumstances, we cannot say that trial counsel's strategy of allowing the two defendants to be tried together to support an inference that only Rodrigues was responsible for the crime was objectively unreasonable, such that no attorney would have pursued it. See *Slaton v. State*, 303 Ga. 651, 654 (3) (b) (814 SE2d 344) (2018) (holding that trial counsel did not make a "patently unreasonable" decision not to move for a severance on the ground that evidence would be admitted that was only admissible against the co-defendant because that evidence "generally supported appellant's defense that [the co-defendant was the one who had] committed the murder" (citations and punctuation omitted)); *Gomez v. State*, 301 Ga. 445, 466 (12) (b) (801 SE2d 847) (2017) (holding

16

that it "was not a patently unreasonable trial strategy" not to "seek to sever [the defendant's] trial" on the ground that some inculpatory evidence about the co-defendant was only admissible against the co-defendant, where trial counsel "believed that the more bad things that came out about [the co-defendant], regardless of the source[,] were good for [the defendant]." (citation and punctuation omitted)). This claim therefore fails.

*Judgment affirmed. All the Justices concur.*